UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. __1:22-mj-03513-Reid__

UNITED STATES OF AMERICA

v.

DIDIER PEREZ PEREZ,
LESTER LEYNIEL SOCA DIAZ, and
YOANDY ALONSO
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?  No

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?  No

Respectfully submitted,

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

BY: _____
Elena Smukler
Assistant United States Attorney
Florida Bar No.    91025
99 N.E. 4th Street
Miami, FL 33172
Tel: 305-961-9444
Email: Elena.Smukler@usdoj.gov

AO 91 (Rev 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) |
|---|---|
| v. | ) |
| DIDIER PEREZ PEREZ, LESTER LEYNIEL SOCA DIAZ, and YOANDY ALONSO | ) Case No.  1:22-mj-03513-Reid |
| Defendant(s) | ) |

## COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of  August 2022 through Sept. 3, 2022  in the county of  Miami-Dade  in the Southern District of  Florida , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. § 1203 | Conspiracy to Commit Hostage Taking |
| 8 U.S.C. § 1324(a)(1)(A)(v)(I). | Conspiracy to Transport and Harbor Illegal Aliens for Profit |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

_Complainant's signature_

Aaron Spielvogel, Special Agent, FBI
_Printed name and title_

Attested to by the applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by Face Time.

Date:  September 3, 2022

_Judge's signature_

City and state:   Miami, Florida    Hon. Lisette M. Reid, United States Magistrate Judge
_Printed name and title_

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Aaron D. Spielvogel, being duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since 2016. I am currently assigned to the High Intensity Drug Trafficking Area ("HIDTA") Task Force, in the FBI Miami Division, where I am responsible for conducting investigations of transnational organized crime, regarding violations of federal law, including the offenses enumerated in Titles 8, 18, 19 and 21 of the United States Code. My duties include investigating violent crimes that involve human smuggling, kidnapping, and extortion, among other crimes. I am, therefore, an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, which empowers me to conduct investigations of, and make arrests for, violations of federal law.

2. I submit this Affidavit in support of a criminal complaint charging Didier Perez Perez ("PEREZ PEREZ"), Lester Leyniel Soca Diaz ("SOCA DIAZ"), and Yoandy Alonso ("ALONSO") with one count of Conspiracy to Commit Hostage Taking in violation of Title 18, United States Code, Section 1203, and one count of Conspiracy to Transport and Harbor Illegal Aliens for Profit, in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(v)(I).

3. The statements contained in this Affidavit are based upon my own personal knowledge, as well as information provided by other individuals, including other law enforcement officials, and my review of records obtained during the course of this investigation. I have not included in this Affidavit each and every fact and circumstance known to me, but only the facts and circumstances sufficient to establish probable cause for the issuance of a search warrant as requested herein.

## PROBABLE CAUSE

4. Conspirators PEREZ PEREZ, SOCA DIAZ, ALONSO, and other unknown co-conspirators (collectively, the "CO-CONSPIRATORS") operated a human smuggling operation that moved Cuban migrants from Cuba to the United States, where they were detained until ransom payments were paid by family members or friends.

5. In or around August 2022, a group of Cuban migrants (hereinafter, the ("VICTIMS") boarded a go-fast style boat in Cuba, believing that they were going to be smuggled into the United States. The VICTIMS arrived in the United States on or about August 30, 2022. The CO-CONSPIRATORS met the VICTIMS when they reached the shore and transported them to a house. Once the VICTIMS arrived at the house, the CO-CONSPIRATORS locked the VICTIMS in the house and told the VICTIMS they had to pay $15,000 USD to be released.

6. The CO-CONSPIRATORS transported at least two of the VICTIMS ("VICTIM 1" and "VICTIM 2") to a house in Miami-Dade County, Florida, where they were also not free to leave. Once the VICTIMS were at the house in Miami-Dade County, the CO-CONSPIRATORS placed telephone calls to family members and friends of the VICTIMS, who resided in Miami-Dade County and elsewhere, telling them they had their relatives and/or friends detained and that they would not release them until they were paid $15,000 USD.

## VICTIM 1

7. On or about September 1, 2022, the CO-CONSPIRATORS placed a telephone call to a friend of VICTIM 1 ("VICTIM 1's Friend"), using a telephone number ending in 1697 ("the 1697 Number"). The CO-CONSPIRATORS told VICTIM 1's Friend that they had brought VICTIM 1 from Cuba to the United States and demanded that VICTIM 1's Friend pay $15,000 USD for VICTIM 1's release. VICTIM 1's Friend asked to see VICTIM 1 to ensure that he was

2

alive and well before paying the $15,000 USD. The CO-CONSPIRATORS told VICTIM 1's Friend to meet them at a gas station located in Miami-Dade County, where they would bring VICTIM 1 just to show him that VICTIM 1 was with them and that they were serious (hereinafter, the "proof of life demonstration"). VICTIM 1's Friend arrived at the designated gas station; he was first met by a man who was driving a red slingshot vehicle. VICTIM 1's Friend advised that the man was wearing a black hat with sunglasses and a face mask that had the American Flag on it. The man told VICTIM 1's Friend to get into the red slingshot vehicle; he then took VICTIM 1's Friend to a nearby vacant parking lot where there was a white Chevrolet Impala with VICTIM 1 and two additional CO-CONSPIRATORS inside.

8.   VICTIM 1's Friend observed what appeared to be a firearm in the front of the Impala. The CO-CONSPIRATORS told VICTIM 1's Friend that they would not release VICTIM 1 until he paid them $15,000 USD. The CO-CONSPIRATORS further told VICTIM 1's Friend that they would leave VICTIM 1 in the middle of the ocean or send him back to Cuba if VICTIM 1's Friend did not pay the $15,000. The CO-CONPSIRATORS told VICTIM 1's Friend that he had until 5:00 PM the following day to pay the ransom.

9.   On or about September 2, 2022, VICTIM 1's Friend contacted law enforcement to report that VICTIM 1 was being held hostage. Law enforcement conducted consensually monitored and recorded phone calls between VICTIM 1's Friend and the CO-CONSPIRATORS using the 1697 Number. During the recorded phone call, one of CO-CONSPIRATORS told VICTIM 1's Friend that they needed to know what they were going to do with VICTIM 1. VICTIM 1's Friend asked the CO-CONSPIRATORS if $5,000 USD in cash and a gold chain worth approximately $2,000 USD was sufficient to pay for the release of VICTIM 1. The

CO-CONSPIRATORS agreed to exchange VICTIM 1 for $5,000 USD and gold and arranged to meet at a parking lot in Hialeah for the exchange.

10. At approximately 4:00 P.M on September 2, 2022, VICTIM 1's Friend, accompanied by an undercover officer, met two of the CO-CONSPIRATORS in the parking lot in Hialeah. VICTIM 1's Friend opened the door of the vehicle, a white 2018 Chevrolet Suburban, and observed VICTIM 1 inside. The CO-CONSPIRATORS told VICTIM 1's Friend to go retrieve the money from his vehicle and they would release VICTIM 1. As soon as the VICTIM 1's Friend confirmed that VICTIM 1 was inside of the vehicle, law enforcement approached the CO-CONSPIRATORS' vehicle, took the two CO-CONSPIRATORS occupying the vehicle into custody, and rescued VICTIM 1. PEREZ PEREZ was driving the vehicle; SOCA DIAZ was sitting in the front passenger seat of the vehicle. Law enforcement confirmed that the Suburban is registered to PEREZ PEREZ's wife.

11. Upon opening the doors of the Suburban and taking PEREZ PEREZ and SOCA DIAZ into custody, law enforcement observed two cellular phones and one firearm in plain view. One of the phones was in the center console in the driver's side cupholder, the other phone was in the front passenger side door panel. The vehicle was towed to a law enforcement lot. The two cellular phones were seized from the vehicle pending the issuance of a search warrant. Law enforcement later placed a call to the 1697 Number (the number used to place the extortion phone calls to VICTIM 1's Friend); the phone in the front passenger side door panel rang, confirming that that phone was used by the CO-CONSPIRATORS to place the extortionate phone calls to VICTIM 1's Friend.

12. Law enforcement thereafter conducted a recorded interview of PEREZ PEREZ. PEREZ PEREZ was advised of his Miranda Rights and agreed to speak to investigators. PEREZ

4

PEREZ denied involvement in smuggling aliens from Cuba and claimed to just be transporting people for SOCA DIAZ. PEREZ PEREZ stated that SOCA DIAZ was communicating with the intended recipient of VICTIM 1 in his presence while they were driving together. PEREZ PEREZ advised that he owns a home in Marathon, Florida. PEREZ PEREZ provided law enforcement with consent to search his cellular phone --- the phone located in the driver's side cupholder.

13. Law enforcement reviewed the contents of PEREZ PEREZ's cell phone and observed WhatsApp audio messages between PEREZ PEREZ and the unknown CO-CONSPIRATORS discussing a boat picking up more than twenty (20) migrants in Cuba. One of the messages included a map specifically highlighting the area between the Florida Keys and Cuba. The photograph of the map was also observed in PEREZ PEREZ's camera roll. PEREZ PER.EZ's cell phone also included saved GPS location data which revealed that PEREZ PEREZ's vehicle had been parked at a residence located at 1251 East 9th Avenue in Hialeah, Florida (hereinafter, the "Hialeah Residence") earlier the same day.

14. Law enforcement further reviewed the contents of PEREZ PEREZ's cell phone and observed photographs of the red slingshot vehicle that Victim 1's Friend described as the vehicle that picked him up from the gas station during the proof of life demonstration of VICTIM 1. Another photograph saved in PEREZ PEREZ's cellular phone was of the license plate and rear end of a white Chevrolet Impala described by VICTIM 1's Friend as being used to transport VICTIM 1 to the proof of life demonstration.

15. A review of the Florida Department of Motor Vehicles (FLDMV) Database revealed that a red 2022 slingshot vehicle is registered to PEREZ-PEREZ' wife. A review of the FLDMV database also revealed that the Chevrolet Impala (whose license plate is included in a

5

photograph in PEREZ PEREZ's phone) is registered to an individual who also resides in Marathon, Florida.

16. Law enforcement reviewed surveillance videos from the gas station where VICTIM 1's Friend met the CO-CONSPIRATORS for the proof of life demonstration of VICTIM 1. The surveillance video shows a red slingshot vehicle drive into the gas station parking lot at approximately the time that VICTIM 1's Friend described meeting the CO-CONSPIRATORS at the gas station.

17. On or about September 3, 2022, law enforcement interviewed VICTIM 1. VICTIM 1 advised law enforcement that he departed from Cuba to the United States on a go-fast boat with approximately fifteen (15) migrants. VICTIM 1 stated that he and the other VICTIMS arrived in the United States approximately two (2) or three (3) days ago. He stated that he, along with the other VICTIMS, were detained by the CO-CONSPIRATORS and were not free to leave until the CO-CONSPIRATORS were paid $15,000 USD for the release of the VICTIMS. VICTIM 1 observed firearms in the residence where he was detained. VICTIM 1 was shown six-pack photographic lineups and positively identified PEREZ-PEREZ, SOCA-DIAZ, and ALONSO as being involved in his hostage-taking, smuggling, and transportation.

18. VICTIM 1's Friend was also shown six-pack photographic lineups. VICTIM 1's Friend positively identified SOCA-DIAZ as one of the two CO-CONSPIRATORS occupying the white Chevrolet Impala during the proof of life demonstration; he also identified SOCA-DIAZ as being present during the exchange of money for VICTIM 1.

### VICTIM 2

19. On or about September 2, 2022, law enforcement conducted surveillance at the Hialeah Residence. Law enforcement observed a vehicle being loaded with people at the Hialeah

Residence and then attempting to drive away from the house. Law enforcement conducted a traffic stop of the vehicle and rescued four (4) Cuban migrants. The driver of the vehicle, YOANDY ALONSO, was also taken into custody.

20. On or about September 3, 2022, law enforcement interviewed VICTIM 2. VICTIM 2 stated that in or about August 2022, he and approximately fifteen (15) other Cuban migrants left Cuba on a go-fast vessel destined for the United States. Once the VICTIMS arrived to the United States, they were transported to a house where they were detained and not free to leave until they paid a $15,000 USD ransom. VICTIM 2 provided the CO-CONSPIRATORS with a phone number for his friend who lives in Miami, Florida ("VICTIM 2's Friend"). The CO-CONSPIRATORS called VICTIM 2's Friend and told him (in the presence of VICTIM 2) that if he did not pay $15,000 USD, they would not release VICTIM 2 from the house. VICTIM 2 advised that the CO-CONSPIRATORS further told him that if the ransom was not paid, they would leave him in the middle of the ocean with a life preserver. VICTIM 2 advised law enforcement that he and the other VICTIMS were locked in a room and were not free to leave. VICTIM 2 stated that he was one of the last remaining five (5) VICTIMS waiting for their ransom to be paid. VICTIM 2 stated that the CO-CONSPIRATORS told him that he was going to be taken later that same day to meet with his friend as a proof of life demonstration in an effort to collect the $15,000 USD. The scheduled proof of life demonstration for VICTIM 2 never occurred; your Affiant believes that this was due to the arrest of PEREZ PEREZ and SOCA DIAZ the same day. VICTIM 2 was shown a six-pack photographic line-up where he positively identified ALONSO and PEREZ PEREZ as being in the Hialeah residence with him during his detention. VICTIM 2 stated he only recognized the top part of PEREZ-PEREZ' face in the 6-pack photo lineup because PEREZ PEREZ was wearing a facemask that had an American Flag design on it.

## CONCLUSION

21. Based upon the aforementioned information, there is probable cause to believe that PEREZ PEREZ, SOCA DIAZ, and ALONSO did with one count of Conspiracy to Commit Hostage Taking in violation of Title 18, United States Code, Section 1203, and one count of Conspiracy to Transport and Harbor Illegal Aliens for Profit, in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(v)(I).

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

_____
Aaron D. Spielvogel
Special Agent
Federal Bureau of Investigation

Attested to by the Applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Face Time this 3rd day of September, 2022.

_____
HONORABLE LISETTE M. REID
UNITED STATES MAGISTRATE JUDGE